```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                      CASE NO. 19-14040-CR-KMM


UNITED STATES OF AMERICA,

            Plaintiff,                       AUGUST 26, 2019
     vs.
                                           FORT PIERCE, FLORIDA
CHARLTON EDWARD LA CHASE,

            Defendant.                         PAGES 1 - 15
_____/


               TRANSCRIPT OF COMPETENCY HEARING

          BEFORE THE HONORABLE SHANIEK M. MAYNARD

                UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

FOR THE GOVERNMENT:     ROLANDO GARCIA, AUSA
                        Office of U.S. Attorney
                        101 South US Highway One
                        Suite 3100
                        Fort Pierce, Florida  34950


FOR THE DEFENDANT:      FLETCHER PEACOCK, AFPD
                        Office of U.S. Public Defender
                        109 North 2nd Street
                        Fort Pierce, Florida  34950




REPORTED BY:            DIANE MILLER, RMR, CRR, CRC
                        Official Court Reporter
                        701 Clematis Street
                        West Palm Beach, Florida  33401
                        561-514-3728
                        diane_miller@flsd.uscourts.gov
```

Monday, August 26, 2019.

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2           THE COURT:  Good morning, you may be seated.
 3           Okay, this is the matter of the United States of
 4   America versus shall to be Edward La Chase, case number
 5   19-14040-Criminal-Moore.  May I have the parties appearances,
 6   please.
 7           MR. GARCIA:  Good morning, Your Honor, Rowland Garcia
 8   on behalf of United States.
 9           THE COURT:  Good morning.
10           MR. PEACOCK:  Good morning, Your Honor; Fletcher
11   Peacock on behalf of Mr. La Chase, who is also present before
12   the Court and using the services of a certified ASL
13   interpreter.
14           THE COURT:  Good morning, Mr. Peacock.
15           And good morning, Mr. La Chase.
16           THE DEFENDANT:  Good morning, Your Honor.
17           THE COURT:  Now, I just wanted to start by noting for
18   the record, we do have two ASL interpreters here today.
19           And, Mr. Peacock, Miss Atkinson has informed me she
20   has interpreted for you and Mr. La Chase in the past.  I want
21   to make sure you have no objection to her severing as an
22   interpreter today as well.
23           MR. PEACOCK:  No, ma'am.  The only thing is, we don't
24   intend to waive any confidentiality for prior discussions.
25           THE COURT:  Okay, all right.  For the record, we will
```

Monday, August 26, 2019.

```
 1  note that.
 2            We are here for a status regarding the competency
 3  hearing.  I did you receive Dr. Shayna Williams' report
 4  regarding her evaluation of Mr. La Chase, and I also received
 5  from the parties an agreed proposed order of commitment
 6  pursuant to 18 United States Code, Section 4241.  I did have
 7  some questions about the report that I wanted to speak with
 8  Dr. Williams about, so let me just -- I'll do that, but let me
 9  first just give either of the parties any opportunity to say
10  anything you would like to, if you need to.
11            Mr. Garcia.
12            MR. GARCIA:  Nothing from the Government.
13            THE COURT:  Okay.
14            Anything, Mr. Peacock?
15            MR. PEACOCK:  No, Your Honor.  And just to update,
16  though, we still maintain that the report is sufficient for the
17  Court to rule, and we still stand by the joint recommended
18  proposed order.
19            THE COURT:  Okay.  All right.
20            Is Dr. Williams here?
21            MR. PEACOCK:  Yes.
22            THE COURT:  Doctor, if you could step forward to the
23  witness stand please.
24            THE COURTROOM DEPUTY:  Will you please raise your
25  right hand.
```

Monday, August 26, 2019.

```
 1            SHAYNA WILLIAMS, Ph.D., DEFENSE WITNESS, SWORN.
 2            THE COURTROOM DEPUTY:  Please have a seat; once
 3   seated, please state your name and spell your last name for the
 4   record.
 5            THE WITNESS:  Shayna Williams, W-I-L-L-I-A-M-S.
 6            THE COURTROOM DEPUTY:  Thank you.
 7                              EXAMINATION
 8   BY THE COURT:
 9   Q.  Dr. Williams, ma'am, thank you very much for making
10   yourself available.  I know it was short notice, but, in
11   reviewing your report, I have a few questions that I just
12   wanted to know a little bit more about.  But could you start by
13   just telling me a little bit about your background?
14   A.  Certainly.  I'm a licensed clinical psychologist.  I've
15   been practicing for about 19 years.  I've also done forensic
16   work, both federal and state competency evals for primarily
17   deaf and hard of hearing, nonverbal clients.
18   Q.  Okay. And what is your experience specifically with deaf
19   and nonverbal clients?
20   A.  My residency -- post-doctoral residency was with Jackson
21   Hospital Deaf and Hard of Hearing Outpatient Clinic.  I quickly
22   became the primary provider in the area of the deaf and hard of
23   hearing for licensed skilled clinical psychologists, so that
24   developed my expertise further.
25   Q.  Okay. Now, I noticed, in your report, you concluded that
```

Monday, August 26, 2019.

```
 1  it is your professional opinion that Mr. La Chase is not
 2  competent to stand trial, at this point.  Can you tell me --
 3  well, why don't I first have you tell me what mental defect
 4  would you diagnose him with.
 5  A.  He had previously been diagnosed with bipolar one disorder,
 6  and I maintained that diagnosis.  He also has psychotic
 7  features.  So bipolar basically says that he has experienced,
 8  at some point, a full-blown manic episode and a serious
 9  depressive episode as well.  And that diagnosis was carried
10  through to the first time I met him a year ago, as well as this
11  time, Your Honor.  Also, he seemed to have character logical
12  weaknesses not uncommon in some deaf individuals, we call it
13  kind of an underdeveloped personality.  And he presented as
14  pre-depressed during the time I saw him this time.
15  Q.  And can you tell me a little bit about what is a meant by
16  an "underdeveloped personality?"
17  A.  Yes, Your Honor.  It has some characteristics of what you
18  might be familiar with as borderline personality; but, in deaf
19  people, it is even more of a persisting character logical way
20  of functioning.  So the way that he might view the world would
21  be through only what he is given directly.
22          Understanding deafness, if you don't give him
23  information directly into his eyes, he doesn't get it.  So it
24  is almost like living in a glass box where the only time you
25  really get information is when an interpreter, a sign-skilled
```

person comes and gives it to you.

      He has average intelligence from a previous test, so what we are really talking about is incidental information, not getting things you would hear on the radio, not getting things you would see on television, not having conversations about drug use or truancy or sex because if it is not given directly through deaf sign, then they don't get it.  As a result, the personalities that by trial and error you usually see developing in early adolescence or middle school don't develop in the same way in the same manner.

Q.  And can you tell me a little bit more about your conclusion about him being -- having bipolar disorder?

A.  So during my evaluation with him, he was extremely grandiose.  He was -- he had a lot of persecutory ideas.  While he appeared more depressed this time, the history of mania might look like attaching special meanings to things, and he also was interacting with some visual stimulus.  Although he denied hallucinations, I was watching him, and he would look away from me and have some kind of a nonverbal interaction with a specific part of the room, and he kept going back to that room.  My thought is, you know, I have to say, if he denied it, he denied it, that's what I put in the report, but there was some communication going on.

Q.  Now I noticed in your I guess conclusion as to each of the factors under the deaf-speak standard, there were some changes

```
 1  from your report back in 2018.  So, for example, appreciation
 2  of the charges or allegations and appreciation of the range and
 3  nature of possibility penalties, you went from finding that
 4  acceptable in 2018 to finding it questionable during your 2019
 5  evaluation.  Can you tell me about why you made that change?
 6  A.  Yes, Your Honor.
 7            The "questionable" for the range and nature of the
 8  possible penalties was that he was so fixated on his tantrum
 9  and his perception of the situation that he couldn't actually
10  list, okay, these are the possible penalties, this is what
11  could happen.  It took quite a few minutes before I could say,
12  "Okay, well, could you go to jail?"
13            He said, "Oh, yeah, I have done that;" so he had some
14  experience with that.  But he couldn't list the four pleas
15  where, previously, he understood not only guilt and innocence,
16  but he also tried to explain the first eval, tried to explain
17  reason of insanity.  This time, he couldn't do it at all.
18  There were a couple factors that may have played into this.
19  One is that he has been in a very language deprived environment
20  for the last year, so certainly that's going to make some
21  impact on mental health and ability to communicate.
22            The appreciation of the allegations and charges, the
23  first time I evaluated him, the charges were different, and he
24  was able to actually specify the charge that he had been
25  taught.  This time, he didn't.  He just said why is he here,
```

```
 1  and why isn't his sister in jail, and he never was actually
 2  able to talk about the charges and allegations.
 3  Q.  And then for his capacity to disclose to his attorney facts
 4  pertinent to the proceeding, that went from questionable,
 5  during your 2018 evaluation, to unacceptable during this
 6  evaluation.  Can you tell me about that?
 7  A.  Yes, Your Honor.
 8           So in the initial assessment, he had a little better
 9  command of language, and I think he had a little more clarity
10  around his ability to explain.  This time, he was very
11  tangential, and he state stayed on topic, off topic, around the
12  topic.  He did communicate that way the first time, as well,
13  but it was more prevalent now to the extent that I felt he
14  would be unable to assist in his defense and actually stay on
15  topic and think through.  It was the level of confusion and
16  delusions was heightened.
17  Q.  And then his capacity to testify relevantly went from
18  guarded to unacceptable.  Now let me just ask:  Is "guarded"
19  like a step above unacceptable but below questionable?
20  A.  Almost.
21  Q.  Okay.
22  A.  I believe it's above questionable.
23  Q.  Okay.
24  A.  But below just acceptable.
25  Q.  Okay, all right.
```

1        Can you tell me about why -- what was different this
2   time from the last time?
3   A.   The same thing, the delusions were very prevalent, the
4   tangentiality, the lack of abstraction, the concrete thinking,
5   the grandiose and self-focus, all of those things made his
6   relevance to the entire situation very complicated and
7   unacceptable.
8   Q.   Now, I noticed when talking about your determination
9   regarding his capacity to testify relevantly, you discussed --
10  it says, "His current level of -- I'm reading from page three
11  of your report, "His current level of cognition may be somewhat
12  muted due to his lack of interaction in a language supported
13  environment.  He reported being isolated, not able to converse,
14  watch captioned TV, participate in recreational activities
15  during his incarceration."
16       Can you just talk to me about how those things -- and
17  you mentioned it a little bit, but how those factors play into
18  your conclusion with respect to his capacity to testify
19  relevantly?
20  A.   I believe that when you are isolated, whatever mental
21  health issues you may have probably are amplified through a
22  lack of interaction, a lack of support.  He has a supportive
23  mother and she has been, I believe, constantly in contact with
24  him.  But apart from that, it could be like people coming up to
25  you and speaking without any verbal protection, just moving

1  their lips.  So while he can use environmental cues, I think
2  the year of just being in isolation has decreased his
3  cognition, his ability.
4      And I say "muted" because I'm not saying that he has
5  changed IQ numbers; but, on top of the depression and his
6  grandiose thinking, all of these mental health issues seem to
7  have decreased his sharpness, his acuity, and his interaction.
8      Did that answer your question, Your Honor?
9  Q.  It does, and it leads me into my next question which is:
10 You, a number of times, made the suggestion or the opinion that
11 he may not be a good candidate for restoration.  What would you
12 recommend would be needed to give him of the best chance?
13 A.  I believe the best chance would be to have his mood
14 stabilized and his psychotic symptoms decreased, I think that
15 would be very useful; certainly, a language supported
16 environment at some level.  I know that's asking a lot, but in
17 some level to have language support would be very useful.  But
18 what that doesn't do is it doesn't build the history of
19 knowledge through time.  It won't bring him up to where a
20 hearing person might function.  So that dearth of information I
21 talk about in the report, that's going to be consistent.  I
22 don't know that we catch that up, because the personality
23 development has already been arrested.
24      THE COURT:  Okay.  Those are all of the questions I
25 had.

Monday, August 26, 2019.

```
 1              Any questions, Mr. Garcia?
 2              MR. GARCIA:  No, Your Honor.
 3              THE COURT:  Any questions, Mr. Peacock?
 4              MR. PEACOCK:  No, ma'am.
 5              THE COURT:  All right, thank you, Doctor; you may
 6   step down.
 7              THE WITNESS:  Thank you.
 8        (Witness excused)
 9              THE COURT:  Okay, I am prepared to enter a version of
10   the proposed order.  I do find, based on Dr. Williams'
11   testimony, that Mr. La Chase is mentally incompetent at this
12   point to proceed to trial, specifically with respect to his
13   capacity to assist properly in his defense.
14              Mr. Peacock, are there any additional recommendations
15   that you would suggest based on his special needs that I should
16   put in the order?
17              MR. PEACOCK:  Your Honor, I honestly don't feel
18   qualified, especially in this case.  We were talking before the
19   Court took the bench that this case is very unique for many,
20   many factors.  It's -- and normally, we would -- you know, we
21   would see a different scenario than we had seen before.  In
22   this case, I don't, so I have to defer.  I think Dr. Williams
23   touched on it, stabilizing the mood; and then I think in her
24   report she also mentions that some very comprehensive and in
25   depth therapy may restore him to competency.  But I will say
```

```
 1  these do look like long-term conditions and not something that
 2  is transient.  So to the extent that the Court can include her
 3  recommendation in the order, I would concur with that.
 4          THE COURT:  Okay.
 5          MR. PEACOCK:  I don't know what BOP would do with
 6  this defendant because of the hearing situation.
 7          THE COURT:  Right.
 8          MR. PEACOCK:  I'm sure they will send him to whatever
 9  facility they would have the best resources for, but I can't
10  give the Court any idea.
11          THE COURT:  Right.
12          MR. PEACOCK:  I mean, if the Court wants me to, I can
13  contact BOP, talk to them.
14          THE COURT:  Well, I was thinking of just asking them
15  to update me, once he gets wherever he is going to, as to what
16  his ability is to be around other deaf people and what
17  resources he is given to communicate.  I would just like to put
18  something in the order --
19          MR. PEACOCK:  Yes, ma'am.
20          THE COURT:  -- specifying that we are aware of these
21  particular issues and, you know, wanting to bring it to their
22  attention and ask them to comply accordingly.
23          MR. PEACOCK:  Yes, ma'am.
24          THE COURT:  Anything, Mr. Garcia?
25          MR. GARCIA:  If you wish, I can confer with Bureau of
```

```
 1  Prisons counsel in Miami regarding your suggestion.
 2           THE COURT:  Yeah, that would be great.
 3           MR. GARCIA:  Okay.
 4           THE COURT:  That would be great, because I just -- I
 5  do think this is a unique case given his disabilities, and I
 6  don't want to enter a standard order and he kind of get lost in
 7  the shuffle and in the process.
 8           If there is any way that we can focus attention on
 9  his specific needs now, before they start making the decisions,
10  then I think that would be helpful.
11           MR. GARCIA:  And specifically, what you would want to
12  know or get feedback from the Bureau of -- whatever facility he
13  goes to, what his situation is and what kind of environment he
14  is in --
15           THE COURT:  What kind of environment he is in,
16  whether he is able to converse with other people who are deaf,
17  whether he is able to watch, I guess, captioned television or
18  has access to communication devices -- I don't know what they
19  allow, but to the degree those are accessible to him, I think
20  that would be important, if possible and -- I mean, obviously,
21  they would have to have a sign language interpreter in any
22  evaluation, but I think flagging those issues and those needs
23  are important.
24           MR. PEACOCK:  Just for Your Honor's information, they
25  do not always use sign language interpreters.  Now, I can't
```

Monday, August 26, 2019.

```
 1  speak how BOP will treat this, but I am aware that sometimes,
 2  for instance, at FDC, they will use a telephone service so --
 3  and it's not very adequate for what we are trying to do here,
 4  so he would need one-on-one interpretation from the ASL
 5  interpreter.
 6          THE COURT:  So maybe asking counsel what they do have
 7  available, how they would handle a defendant in this particular
 8  situation, and then I can know sort of a realm of options to
 9  put in my order.
10          MR. GARCIA:  Right.  And I have a previously spoken
11  with BOP counsel, and the defendant is not going to FDC.  He
12  would be going to Butner or a similar type of facility which
13  essentially is a hospital.  Obviously, he can't get up and
14  leave, but they do have the resources to deal with the
15  situations like this; but, I will get more clarity from BOP
16  counsel.
17          THE COURT:  Okay, all right; thank you.
18          If there is nothing else from either side -- are you
19  all filing Dr. Williams report under seal?
20          MR. GARCIA:  I thought it was.
21          MR. PEACOCK:  I thought the Court had already
22  received it.  We can do that.
23          THE COURT:  All right.  If you could file it under
24  seal, that would be great.
25          MR. PEACOCK:  Do you want both reports?
```

Monday, August 26, 2019.

```
 1            THE COURT:  Yes, both reports.  The second one refers
 2  to the first one.
 3            MR. PEACOCK:  What would Your Honor like us to do
 4  regarding BOP information?
 5            THE COURT:  Today is Monday.  Do you think you could
 6  respond by like Wednesday?
 7            MR. PEACOCK:  We will certainly try, Your Honor.
 8            THE COURT:  I would like to get this order out.  I
 9  know calendar call has already been set, so we need to get
10  our -- I need to get my side of this done so that he can
11  transition.
12            MR. PEACOCK:  Yes, ma'am.
13            THE COURT:  All right.  Thanks, everyone.
14       (PROCEEDINGS ADJOURNED AT 10:30 a.m.)
15                    C-E-R-T-I-F-I-C-A-T-E
16            I hereby certify that the foregoing is
17        an accurate transcription and proceedings in the
18        above-entitled matter.
19
    12/16/2019                    /s/DIANE MILLER
20  DATE                          DIANE MILLER, RMR, CRR, CRC
                                  Official Court Reporter
21                                United States District Court
                                  701 Clematis Street, Room 259
22                                West Palm Beach, FL  33401
                                  561-514-3728
23

24

25
```

Monday, August 26, 2019.